George Herbert WHARTON,
Petitioner–Appellee,

v.

Arthur CALDERON, Warden of the California State Prison at San Quentin,
Respondent–Appellant.

Nos. 96–99021, 96–99023.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 25, 1997.

Decided Nov. 5, 1997.

Richard S. Moskowitz, Deputy Attorney General, Los Angeles, California, for respondent-appellant.

Michael W. Fitzgerald, Law Offices of Robert L. Corbin, Los Angeles, California, for petitioner-appellee.

Before: HUG, Jr., Chief Judge, and BROWNING and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

George Herbert Wharton has pending in the district court his petition for a writ of habeas corpus challenging his first-degree murder conviction, with special circumstance, and sentence of death in the California state courts. *See People v. Wharton,* 53 Cal.3d 522, 280 Cal.Rptr. 631, 809 P.2d 290 (1991). In his habeas petition, Wharton raises, *inter alia,* broad claims of ineffective assistance of counsel.

On Wharton's motion, the district court issued a protective order prohibiting the respondent Warden of the San Quentin State Prison (Warden) from communicating with 14 potential witnesses and two groups,[1] except by noticed deposition.[2] The Warden

---

1. These are the Santa Barbara County Public Defender's Office and the California Appellate Project, a death penalty resource center.

2. These persons and groups are listed in Appendix "A" hereto. Wharton's motion was denied as to Lilia P. Rochester, identified in his motion as "a handwriting expert retained by Mr. Duval [Wharton's state trial attorney] to analyze petitioner's handwriting sample," and "[t]he entire staff of MRI Medical Imaging Group, Inc., a clinic which conducted a magnetic resonance imaging (MRI) test of petitioner at the behest of Dr. Rack."

appeals from that order and a subsequent order of clarification.[3]

In his first amended petition for writ of habeas corpus, Wharton alleges the ineffective assistance of trial counsel. These allegations consist of 29 separate claims, some with multiple sub-parts. In addition, Wharton also alleges claims for the ineffective assistance of psychiatric experts, appellate counsel and numerous claims of ineffective assistance of trial counsel in connection with his 1975 second-degree murder conviction.[4]

The district court recognized that "[w]hen a petitioner in a habeas corpus action raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege. (citation omitted)." It also found "that Petitioner impliedly waived the attorney-client privilege at the time his habeas corpus petition was first filed in federal district court." While recognizing that "wide-ranging attacks on the competence of counsel may imply a broad waiver of the attorney-client privilege," the district court concluded that "it does not follow that Petitioner has waived the privilege as to *all* communications with his counsel." (Emphasis in original.) However, the trial court made no finding of what areas, if any, of attorney-client communication remain unwaived. Thus, it appears that the district court proceeded on the assumption that there were potential areas of unwaived attorney-client communication which deserved the court's protection.

The district court also recognized, however, that the Warden "should be allowed to inquire into the circumstances surrounding Petitioner's claims in order to present an adequate defense." It found, however, that "allowing Respondent to have informal and unlimited contact with Petitioner's former counsel would not adequately safeguard Petitioner's interest in protecting the scope of his implied waiver. Therefore, counsel for Petitioner should be given the opportunity to protect Petitioner's interests in a more for-mal and regulated setting." The district court then entered its order prohibiting the Warden "from communicating with Petitioner's former trial or appellate counsel and their agents about any matters relating to Petitioner's [Petition] for a Writ of Habeas Corpus except in a deposition setting, with Petitioner's counsel present." The district court did not, on the record, consider any less restrictive alternative to its blanket no-interview protective order.

I.

We must first determine whether the protective order, and its clarification order, are appealable under the collateral order doctrine, as the Warden contends it is. For an interlocutory order to be appealable as a "collateral order," it must satisfy three requirements: It must be conclusive, resolve an important question separate from the merits, and be effectively unreviewable on appeal from a final judgment. *Swint v. Chambers County Comm'n,* 514 U.S. 35, 42, 115 S.Ct. 1203, 1207, 131 L.Ed.2d 60 (1995); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). Wharton concedes that the protective order meets the first requirement of conclusiveness, and we agree. He disputes, however, that it meets the remaining two requirements. We disagree.

In *Jackson v. Vasquez,* 1 F.3d 885 (9th Cir.1993), we held that an order requiring the State, at its expense, to transport a potential habeas corpus petitioner[5] to a medical facility for a brain scan met the second and third requirements of the collateral order doctrine. *Id.* at 888. On the second requirement, we said:

The transportation order also resolves an important issue that is completely separate from the merits of the underlying action. The decision that the Warden ap-

---

3. The order of clarification raises a number of subsidiary issues; however, in light of our disposition of the primary issues, these need not be resolved.

4. This prior conviction for murder was the special circumstance alleged against Wharton, which made him death-eligible. *See* Cal. Pen. Code § 190.2(a)(2).

5. In accordance with the practice in the Central District of California, Jackson and his attorney were "prepar[ing]" a habeas corpus petition." 1 F.3d at 886. *See* C.D.Cal. Local Rule 26.8.7(c) (providing for temporary stay of execution for newly-appointed counsel to prepare petition); *Brown v. Vasquez,* 952 F.2d 1164, 1165 (9th Cir.1991), *amended,* (1992).

peals here is the district court's determination that it possessed the legal authority to issue the transportation order. The Warden's claims present pure questions of law that can be reviewed without reference to the merits of Jackson's habeas corpus petition. The transportation order is not a mere step toward final disposition of Jackson's claims, but rather it " 'plainly presents an important issue separate from the merits' " of the habeas petition. *Gulfstream Aerospace [Corp. v. Mayacamas Corp.],* 485 U.S. [271] at 277, [108 S.Ct. 1133, 1137, 99 L.Ed.2d 296 (1988)] (quoting *Moses H. Cone [Memorial Hosp. v. Mercury Const. Corp.],* 460 U.S. [1] at 12 [103 S.Ct. 927, 935, 74 L.Ed.2d 765 (1983)]); *see also Cohen,* 337 U.S. at 546, 69 S.Ct. at 1225.

*Id.* With respect to *Cohen's* third requirement, we held:·

> Finally, the transportation order will evade effective review on appeal of the decision on Jackson's petition for habeas corpus. Regardless of the district court's disposition of the habeas petition, the Warden will not be able to show, on appeal from the final decision, that he was unfairly prejudiced in the habeas proceedings as a result of his compliance.

*Id.*

What we held with respect to the transportation order in *Jackson* applies with equal force to the protective order here. The Warden's right to interview witnesses is "an important issue that is completely separate from the merits of the underlying action" that has been "resolved" by the protective order. That order also "will evade effective review on appeal of the decision on [Wharton's] petition for habeas corpus," because "the Warden will not be able to show, on appeal from the final decision, that he was unfairly prejudiced in the habeas proceeding as a result of his compliance." *Id.*

Thus, the protective order satisfies all three requirements of the collateral order doctrine; accordingly, we have jurisdiction over this appeal.

## II.

We observe at the outset that a party's right to interview witnesses is a valuable right. Witness interviews are one of the primary investigative techniques. Every federal criminal law practitioner is familiar with "302s," the FBI's witness interview form and the potential value of access to the 302s in any case. Witness interviews serve a different purpose than depositions. As one court observed:

> [T]here are entirely respectable reasons for conducting discovery by interview *vice* deposition: it is less costly and less likely to entail logistical or scheduling problems; it is conducive to spontaneity and candor in a way depositions can never be; and it is a cost-efficient means of eliminating non-essential witnesses from the list completely.

*Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C.1983). *See also Cacoperdo v. Demosthenes,* 37 F.3d 504, 509 (9th Cir.1994) ("both sides have the right to interview witnesses before trial") (citations and internal quotations omitted); *United States v. Cadet,* 727 F.2d 1453, 1469 (9th Cir.1984) ("Witnesses ... are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.") (citation and internal quotations omitted).

Finally, in *International Bus. Mach. Corp. v. Edelstein,* 526 F.2d 37 (2d Cir.1975), the court held that the trial judge had exceeded his authority by restricting witness interviews, stating that the trial judge "apparently looked upon an interview as the taking of a deposition," when, "[i]n fact, there is little relation between them." *Id.* at 41. The court further noted the "time-honored and decision-honored principles ... that counsel for all parties have a right to interview an adverse party's witness (the witness willing) in private, without the presence or consent of opposing counsel and without a transcript being made." *Id.* at 42.

Keeping in mind these background observations, we turn to the issues at hand.

## III.

■ Wharton concedes that the protective order in this case is not authorized by Fed. R.Civ.P. 26, or any other codified source. *See Eli Lilly,* 99 F.R.D. at 128 (Federal

Rules do not preclude "*ex parte* interview of a witness who is willing to speak") (citations omitted). He contends, however, that the court has the inherent authority to regulate the conduct of attorneys appearing before it. While we do not disagree with this general proposition, the issue is the reach of that inherent authority and whether the district court exceeded it here.

■ We have not heretofore determined the standard of review of a protective order entered under the trial court's inherent authority. However, we review discovery orders generally for abuse of discretion. *See, e.g., Home Sav. Bank, F.S.B. v. Gillam,* 952 F.2d 1152, 1157 (9th Cir.1991) (protective order preventing deposition reviewed for abuse of discretion). We also review the district court's exercise of its inherent authority for abuse of discretion. *Primus Automotive Fin. Serv., Inc. v. Batarse,* 115 F.3d 644, 648 (9th Cir.1997) (reviewing sanctions imposed under inherent powers for abuse of discretion). We have also held that "[t]he standard of review for the district court's exclusion of evidence is the same under both Rule 37 and the court's inherent powers." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,* 982 F.2d 363, 367 (9th Cir.1992). We, thus, conclude that a protective order entered under the court's inherent authority should be reviewed for abuse of discretion.[6]

## IV.

■ The district court bottomed its authority to issue the protective order on two bases. First, it believed that it had the authority to protect ("adequately safeguard") any remaining, unwaived areas of Wharton's attorney-client privilege in the out-of-court interview setting. It acted on an erroneous legal premise.

■ The attorney-client privilege, like most other privileges, is an *evidentiary* privilege-it protects against the compelled disclosure in court, or in court-sanctioned discovery, of privileged communications. It is not a roving commission to police voluntary, out-of-court communications. For example, the

provisions of Division 8 of the California Evidence Code, governing privileges, "apply in all proceedings." Cal. Evid.Code § 910. And "proceeding" is defined as "any action, hearing, investigation, inquest, or inquiry (whether conducted by a court, administrative agency, hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, *pursuant to law, testimony can be compelled.*" Cal. Evid.Code § 901 (emphasis added). Similarly, the Federal Rules of Evidence apply only to courts and proceedings conducted by judges. *See* Fed. R.Evid. 1101(a), (b). Rule 1101 goes on to specifically to provide: "The rule with respect to privileges applies at all stages of all actions, cases, and proceedings." Fed.R.Evid. 1101(c).

■ As we observed in *United States v. Rogers,* 751 F.2d 1074 (9th Cir.1985), "[t]he attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer." *Id.* at 1077. We held that the rule does not apply where there is no "forced disclosure of a confidential communication in a judicial proceeding." *Id.; see also United States v. White,* 970 F.2d 328, 336 (7th Cir. 1992) (government's interview of defendant's former attorney did not violate attorney-client privilege because "attorney-client privilege is a testimonial privilege. Consequently, so long as no evidence stemming from the breach of the privilege is introduced at trial, no prejudice results." (citing *Rogers,* 751 F.2d at 1079)).

Obviously, a voluntary, out-of-court interview is not a "stage of [an] action;" nor is it one "authorized by law" in which "testimony can be compelled." Thus, a court's authority to "protect" the attorney-client privilege simply does not extend, at least absent some compelling circumstance, to non-compelled, voluntary, out-of-court interviews, any more than it does to an after-dinner conversation. The attorney-client privilege is a rule of evidence. It does not provide a legal basis to

---

6. We reach this conclusion despite both sides' agreement that the issues raised on this appeal are subject to *de novo* review. We note, however, that a court abuses its discretion when it acts on the basis of an erroneous legal premise. *Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996).

support issuance of the district court's "protective order," which purports to bar out-of-court interviews to which the rules of evidence do not apply.

## V.

 The second basis of the district court's protective order was the following statement it quoted from an attorney disqualification case:

> It is well-settled, however, that "[i]n the absence of rules promulgated by higher authorities in the judicial system, district courts are free to regulate the conduct of lawyers appearing before them."

(quoting *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey*, 722 F.2d 435, 439 (9th Cir.1983)).[7] Although the language quoted by the district court does appear in *Iacono*, it provides no authority for the "regulation" imposed by the protective order here.

*Iacono* dealt with the authority of a district court to disqualify an *attorney appearing before it*. The issue was whether disqualification could be based on the American Bar Association's Model Code of Professional Responsibility (Model Code), even though it had not specifically been adopted either by the State Bar of California or the district court. *Id.* In that context, *Iacono* held that, in the absence of a specific local rule to the contrary, the district court could "look[ ] to the Model Code as a source of ethical standards under [the] Local Rule...." *Id.* at 440 (citation omitted).

Iacono is inapplicable here for several reasons. First, the district court in *Iacono* was regulating the conduct of attorneys *appearing before it* and determining whether a conflict of interest disqualified those attorneys from appearing in the case. Here, the brunt of the district court's ethical regulation falls on attorneys who are not before the court,

*i.e.,* Wharton's former state court attorneys. Even assuming those attorneys have a continuing ethical obligation to Wharton not to disclose unwaived, privileged communications,[8] *Iacono* does not authorize the district court to reach out and "regulate" attorneys not appearing before it. *Cf. United States v. Edgar*, 82 F.3d 499, 508 (1st Cir.) (no prejudice in former attorney's testifying before grand jury; "first line of defense to protect Edgar's privilege lay in the hands of his lawyer"), *cert. denied,* —— U.S. ——, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996). The district court is not the State Bar of California or the State Bar Court. It has no charter to insure that all attorneys within the Central District of California[9] comply with the State Bar Act. From the perspective of regulating the ethical conduct of attorneys, *Iacono* does not support the district court's reaching out to regulate the conduct of attorneys not appearing before it.

With regard to the Warden's attorneys, no ethical rule prohibits one attorney from interviewing another. While it is true that attorneys have an ethical duty under the Model Rules of Professional Conduct not to "knowingly assist or induce another to violate or attempt to violate the Rules of Professional Conduct" (Rule 8.4(a)), there is no evidence here that the Warden's attorneys would seek to induce Wharton's former attorneys to violate their ethical duties to Wharton during the proposed interviews.

## VI.

 Finally, Wharton argues that the protective order was authorized as an exercise of the district court's inherent authority.

The inherent authority or powers of a court are those "which cannot be dispensed with in a Court, because they are necessary

---

**7.** Further, the district court thought that its interest "in having a clear record of review clearly outweighs the impact of the limited restrictions to be placed on Respondent's contact with Petitioner's former counsel." Although the district court's desire to have a "clear record" is commendable, it cannot furnish a substantive basis for the substantial out-of-court restrictions imposed on the Warden.

**8.** The Calif. State Bar Act provides, *inter alia:*

> It is the duty of an attorney to do all of the following:
>
> . . .
>
> (e) To maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.
>
> Cal. Bus. & Prof.Code § 6068(e).

**9.** For that matter, there is nothing in the record to indicate that any of Wharton's former state court attorneys are members of the bar of the Central District of California.

to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2131, 115 L.Ed.2d 27 (1991) (internal quotations omitted).

> These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly expeditious disposition of cases."

*Id.* (quoting *Link v. Wabash R.R.*, 370 U.S. 626, 630–32, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)). As broad as the scope of the inherent power of a federal court may be, it does not encompass the protective order at issue here. It cannot be justified as a sanction, *see Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir.1992), as an attorney disciplinary measure, *see United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir.1996), or as necessary to control the courtroom or proceedings pending before the court. *See Chambers*, 501 U.S. at 44, 111 S.Ct. at 2132. As an exercise of the court's inherent authority, the protective order was an abuse of discretion.

### VII.

Because there is no basis in law, including its inherent authority, to support the district court's issuance of the protective order, it must be vacated.[10]

REVERSED and REMANDED for further proceedings.

### APPENDIX "A"

*"Witnesses" Listed in the Protective Order*

The terms and conditions of this [Protective] Order will apply to the following witnesses:

(1) William L. Duval, Jr., the attorney who represented Petitioner in his 1987 murder trial;

(2) Horace N. Freedman, the attorney who represented Petitioner in the automatic appeal of his conviction and death sentence to the California Supreme Court;

(3) Gilbert W. Lentz, a law partner of Mr. Duval, who also represented Petitioner in his 1987 murder trial;

(4) Edward Murphy, the Santa Barbara [Deputy] County Public Defender who rep-

resented Petitioner in his 1975 murder case;

(5) The [entire] Santa Barbara County Public Defender's Office which briefly represented Petitioner in his 1987 murder case and also represented Petitioner in his 1975 murder case;

(6) The California Appellate Project ("CAP");

(7) Any investigators or doctors retained by counsel for Petitioner in preparation for Petitioner's 1975 murder case;

(8) Any investigators retained by counsel for Petitioner in preparation for Petitioner's 1987 murder case, including, but not limited to, Craig Stewart and Ferd Rapp; and

(9) Any doctors retained by counsel for Petitioner in preparation for Petitioner's 1987 murder case, including but not limited to: Dr. Alex Caldwell, Dr. Neil Karp, Dr. Donald Patterson, Dr. Willian Rack, Dr. Robert Sbordone, Dr. Ronald Siegel, Dr. Richard Steinberg, and Dr. Michael Stulberg.

---

**10.** Because we resolve this appeal on non-constitutional grounds, we do not reach the Warden's contention that the protective order infringed his rights under the First Amendment.